Joseph H. Low IV (SBN 194897)
THE LAW FIRM OF JOSEPH H. LOW IV
One World Trade Center
Suite 2320
Long Beach, CA 90831
(562) 901-0840
(562) 901-0841 Facsimile

Attorney for Plaintiffs
THE ESTATE OF DENNIS PAUL TORGERSON
and CHERYL TORGERSON

IN THE UNITED STATED DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA,

(SAN FRANCISCO DIVISION)

| | |
|---|---|
| THE ESTATE OF DENNIS PAUL TORGERSON, Deceased, by CHERYL TORGERSON, Personal Representative, and CHERYL TORGERSON, a natural person,<br><br>    Plaintiffs,<br><br>vs.<br><br>SMITHKLINE BEECHAM, d/b/a GLAXO SMITHKLINE, a British corporation, and Does 1 through 20, inclusive,<br><br>    Defendants. | **CASE NO. CV 07 050258 JCS**<br><br>PLAINTIFFS' COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL<br><br>(Product Liability, Negligence, Breach of Warranty and Wrongful Death) |

## **COMPLAINT**

CHERYL TORGERSON, individually and as personal representative of the estate of her husband Dennis Paul Torgerson, deceased, files this suit against defendants SMITHKLINE BEECHAM, d/b/a GLAXO SMITHKLINE and DOES 1 through 20, inclusive, complaining about the personal injuries to, and wrongful death of, Dennis Torgerson.

## Nature of the Case

1. This is a California diversity, products liability, personal injury and wrongful death case arising out of the untimely death of Dennis Torgerson on or about January 27, 2004, in Placerville, CA. At the time of his death by self-inflicted gunshot wound, Mr. Torgerson was under the influence of a powerful, serotonergic, psychotropic drug, called "PAROXETINE" which was manufactured, marketed and distributed by Defendant SMITHKLINE BEECHAM, d/b/a GLAXO SMITHKLINE, under its brand name "Paxil" and also, in its generic form via license to a company called Par Pharmaceuticals.

## Parties

2. Plaintiff Cheryl Torgerson is a resident of California. Cheryl is both the personal representative of Dennis Torgerson's Estate and his surviving spouse. Thus, pursuant to Cal. Code Civ. Pro. §377.30, she is entitled to bring a survival action on behalf of Dennis Torgerson for the damages he sustained prior to his death. She is additionally the proper to party to bring a wrongful death action to recover damages on behalf of Dennis' heirs, Cal. Code Civ. Pro. §377.60.

3. Defendant SmithKline Beecham d/b/a Glaxo SmithKline [hereinafter "GSK"] is a British-owned and controlled pharmaceutical company with dual American headquarters in Philadelphia, Pennsylvania, and North Carolina. It designed, manufactured, and marketed the serotonergic, psychoactive medication "PAROXETINE" which is the subject of this lawsuit.

4. The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 to 20, inclusive, are unknown to plaintiffs, who therefore sue said defendants by said fictitious names. Plaintiffs will amend this complaint to show said Defendants' true names and capacities when the same have been ascertained. Plaintiffs are informed and believes and therefore alleges that Defendants, DOES 1 TO 20, inclusive, are responsible under law in some manner, negligently, strictly or otherwise, for the events and happenings hereinafter described, and thereby proximately caused the wrongful death, injuries and damages to Plaintiffs as herein alleged.

5. Plaintiffs are informed and believes and therefore alleges that at all times mentioned herein, each of the Defendants was the agent, servant and/or employee of each other and /or were, in doing the acts herein alleged, acting within the course and scope of this agency and/or employment and with the permission, consent and authority of their co-Defendants and each of them individually, and each is responsible in some manner for the occurrences hereinafter alleged; and that Plaintiff's injuries were proximately caused by the actions of each Defendant.

## Jurisdiction

6. Jurisdiction is based on diversity of citizenship. 28 U.S.C. §1332. The amount in controversy is substantially in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

## Venue

7. Venue is permissible in this District pursuant to 28 U.S.C. §1391 because a defendant resides in this district and all the defendants reside in this state pursuant to 28 U.S.C. §1391(A)(1). In a state such as California which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time the action is commenced, such corporation is deemed to reside in any district in that state within which its contact woud be sufficient to subject it to personal jurisdiction if that district were a separate state. 28 U.S.C. §1391(A)(1)(c). Defendant GSK has sufficient contacts to subject it to personal jurisdiction in this district if this district were a separate state. Thus, venue is proper in this county.

## Intradistrict Assignment

8. Intrdistrict assignment to this location is appropriate because venue is based on 28 U.S.C. §1391(A)(1)(c), which provides that venue is proper in any district in which the defendant's contacts would be sufficient to subject it to personal jurisdiction if that district were a separate statement. Section 1391(a)(1)(c) does not mandate filing in a particular location within a district, nor do the local rules of this court specify a particular location for filing of a lawsuit within this district where venue is based on 1391(a)(1)(c). The plaintiffs are

///

COMPLAINT (Torgerson v. Glaxo SmithKline) – 3

informed and believe that the defendants' contacts with this division of the district are substantial by virtue of the sizable population within this division.

### Facts

It has become necessary to file this suit as a result of the following facts.

### Mega-Marketing of Paxil/Paroxetine

9. PAROXETINE is a powerful, mind altering drug which is specifically designed and marketed to alter a person's serotonin system. It is a member of the class of drugs commonly called "Selective Serotonin Reuptake Inhibitors" or "SSRI's" for short.

10. Prozac (generic name "FLUOXETINE") was the first drug in this class to be approved by the FDA in this country. GSK's PAROXETINE was the third. From 1993 to the present GSK has marketed PAROXETINE under its banner brand names "Paxil' and 'Paxil CR." For most of the time GSK has enjoyed patent protection, and the commensurate super-profits that go with such protection, for its Paxil sales. Thus, it has been a flagship product for GSK, achieving annual revenues in some years in excess of *three billion dollars*.

11. In the late 1990's, GSK's patents on Paxil came under legal attack in court proceedings. One of the companies which was challenging GSK was generic drug maker Par Pharmaceutical, Inc.[1] On Friday, April 18, 2003, in a shrewd "if you can't beat 'em, join 'em" maneuver; GSK co-opted this generic manufacturer, and capitalized on its extensive customer base, via a license agreement. Specifically, GSK entered into a license or distribution agreement with generic distributor Par Pharmaceuticals, Inc. Scott Tarriff, President and CEO of Par, explained the advantages of this arrangement to his people in an internet based conference call on April 21, 2003. His statements included the following:

---

[1] Par actually obtained its putative rights to PAROXETINE via its November 27, 2001 license agreement with Pentech Pharmaceuticals, Inc. In actuality it was Pentech rather than Par which pursued the patent litigation against GSK.

COMPLAINT (Torgerson v. Glaxo SmithKline) – 4

> And basically what we did was trade our 10 and 20 milligram caps for what amounts to shared exclusivity in an over $2b marketplace. The best way to explain it is we traded up on draft day. . . . As part of this, GSK will be supplying tablets to PAR. Therefore, we do not need to worry about having our ANDA approved on time. We don't have to worry about manufacturing.

12. GSK's 2004 financial statements chronicle some of the advantages of this arrangement to GSK. They include (a) "a royalty payable to" GSK's "Group" and (b) an acknowledgment that GSK's patent "is valid and enforceable and would be infringed by Pentech's proposed capsule product." GSK Financial Report at 117 (2004). The press release issued by GSK on April 18, 2003, lists another advantage: "The litigation and the settlement do not involve Paxil CR."

13. At first, Par's deal with GSK only permitted it to sell PAROXETINE in Puerto Rico. However, on September 8, 2003, when another generic drug company, Apotex, launched its generic version of PAROXETINE, this triggered Par's ability to sell the drug in the United States. On that very day it began shipments of PAROXETINE to its customers in the United States. From this date, until March 8, 2004, Par enjoyed shared exclusivity in this lucrative[2] market.

14. Thus, even though Par was the distributor of the PAROXETINE which Dennis Torgerson took, it was GSK which manufactured, licensed, and injected it into the stream of commerce. Indeed, Par has never been authorized by the FDA to market PAROXETINE. Rather, under the terms of Par's license agreement with GSK, Par flies under the aegis of GSK's approved Paxil NDAs. Moreover, GSK actually manufactures the PAROXETINE which is sold

---

[2] Par's 2004 sales of PAROXETINE were $222 million. Obviously, GSK benefited from these sales via either (a) purchases of the drug from GSK and/or (b) license fees.

by Par in this country. Additionally, on information and belief, GSK has agreed to indemnify Par fully for any claims made by consumers like the Torgerson family.

15. Having thus injected paroxetine into the stream of commerce,[3] via manufacture and license/distributing agreement, GSK is fully liable for all claims arising out of Dennis Torgerson's ingestion of the generic form of paroxetine.

### GSK's "Too Little, Too Late" Warning about Paxil & Suicide

15. PAROXETINE is strongly associated with patient suicidality and its precursor conditions. Ironically, the only Paxil wrongful death case to go to trial in this country was tried in the spring of 2001. In that case, on June 6, 2001, a Wyoming Federal jury found that "Paxil can cause some people to become homicidal and/or suicidal." *Tobin v. SmithKline Beecham Pharmaceuticals*, 164 F.Supp.2d 1278 (D.Wy. 2001). It also found GSK to be at "fault" for failing to warn and to test. *Id*. The court held, both before and after the verdict, that said verdict was supported by scientifically reliable, legally admissible evidence. *Id.*

17. In the wake of the *Tobin* verdict GSK could, and should, have warned. It was the reasonable, responsible, and morally proper thing to do. In reasonable probability, a prompt warning at that time would have saved Dennis Torgerson's life. Rather, GSK stalled.

18. In June of 2003 the British government "contraindicated" PAROXETINE for children and adolescents because of an increased risk of suicide. Knowing by virtue of the *Tobin* verdict and the evidence which supports it that the risk applies to adults as well as children, GSK could, and should, have issued a strong warning at that time. In all likelihood, and via legal presumption, such a warning would have saved Dennis Torgerson's life. But the profits were just too high. So, once again, GSK stalled.

19. Other manufacturers of similar drugs have issued *sua sponte* warnings about the association between their serotonergic drugs and an increased risk of suicide. Specifically, on August 22, 2003, in accordance with the regulatory authority of 21 CFR §314.70 (which

---

[3] *See Ogle v. Caterpillar Tractor* Co., 716 P.2d 334 (Wyo. 1986) and its progeny.

empowers a manufacturer to "add or strengthen warnings" without waiting for FDA approval), fellow SNRI[4] manufacturer Wyeth issued a "Dear Doctor" letter alerting the medical profession about the dangers of Effexor-induced suicidality, at least in the pediatric population. Once again, GSK had a choice to make B to warn, or to remain silent. Again, it failed to warn.

20. Sadly, regulatory activity often lags behind developments in both the scientific literature and the courts. However, on March 22, 2004 (nearly three years after the *Tobin* verdict, and, nearly two months after Dennis Torgerson's death) the FDA itself issued a Public Health Advisory "recommending" that GSK and the manufacturers of other SSRI drugs issue warnings about the increased risks of suicidality and its precursors and associated conditions, for *both* adults and children.

21. GSK could, and should have issued **immediate** warnings. It was the right thing to do. It would have saved lives. Even though a warning at this time would have been too late to save the life of Dennis Torgerson, it may well have saved the lives of others. But despite the scientific, legal, and FDA evidence all indicating there was a problem with GSK's flagship product, GSK stalled.

22. There is a likely explanation/motivation for GSK's stalling. According to its SEC filings, in the first quarter of 2004, GSK was raking in $5,857,142/day from Paxil sales. GSK's Vice President for Marketing, Bonnie Rosello, has stated in the following candid but understated sworn concession in the *Tobin* case, a warning concerning the association between Paxil and suicide "**probably wouldn't help sales**." (Ms. Rosello's *Tobin* deposition at 57-58). Her boss, GSK Director Dr. Yamada was even more forthcoming, frankly admitting that "**I believe that a**

---

[4] SNRI's, or Serotonin-Norepinephrine Reuptake Inhibitors, are "dual action" SSRI's. The difference between the two is that SNRI's act on both serotonin and norepinephrine receptors while SSRI's act only upon serotonin receptors. For purposes of this litigation, however, they are both treated as a class by the FDA in regards to safety related warnings.

**black box warning would have an impact on the sales of Paxil, yes.**" (Yamada *Tobin* deposition at 68).

23. Finally, in April/May 2004, GSK apparently decided to issue a lukewarm "warning" of sorts. It claims that it sent out "Dear Doctor" letters to alert physicians to the dangers of a potential "association" between Paxil and suicidality. Unfortunately, however, the letter and accompanying label change information actually disclaimed any causal relationship. Moreover, the letter conveyed the impression that any increase in risk applied only to patients who had a "major depressive disorder." Thus, this putative "warning" letter was not only "too little/too late" to save the life of Dennis Torgerson, but was still woefully, and legally, "inadequate."

24. On October 15, 2004, the FDA recommended

**BLACK BOX WARNINGS**

regarding Paxil induced suicidality (in children and adolescents). In early 2005, after additional stalling, GSK finally implemented these warnings. In view of the fact that the *Tobin* plaintiffs and their experts had specifically advocated such "**BLACK BOX warnings**" regarding Paxil induced suicidality in adult patients, GSK was fully on notice that pursuit of such warnings was the reasonable thing to do. Its failure to seek and issue stronger warnings at an earlier time is negligence under the law.

25. The developing science and regulatory actions have continued to reinforce both the "association" between Paxil and suicidality, and the necessity of more stringent warnings about that association. In May of 2005, the FDA posted a health advisory on its website in which it stated, *inter alia*, that 1 in 50 pediatric patients on Paxil developed suicidality "**due to drug.'** On June 30, 2005, the FDA issued a similar Public Health Advisory about the similar risk in the adult patient population. And in May 2006, in a "Dear Doctor" letter which analyzed data that had been in GSK's possession for a long time, GSK cautioned about an increased risk of suicidality for adult patients.

26. Most recently, as a result of further "reclassification" efforts by the FDA, on November 16, 2004, the FDA extended its finding of causality through age 24, and, on December 13, 2006, an FDA Advisory Panel recommended a further extension of the **BLACK BOX** warning to patients in this age group.

27. The bottom line is that GSK has not given legally adequate warnings about the association between an increased risk of suicidal behavior and its precursors conditions and Paxil. Had GSK given such legally adequate warnings, it is probable that it would have saved Dennis Torgerson's life.

28. In light of the *Tobin* verdict, coupled with the subsequent FDA rulings (and the absence of any contrary court decisions), GSK should be collaterally estopped to deny that "Paxil can cause some people to commit suicide" and that it is "at fault' for failing to warn/test about this danger.

29. It is against this backdrop that the tragic, untimely death of Dennis Torgerson must be assessed.

### The Tragic, Unnecessary Death of Dennis Torgerson

30. Dennis Paul Torgerson was born June 8, 1943, in Altadena, California. An insurance adjuster for most of his career, Dennis had a lifelong love of airplanes and possessed a pilot's license for over 30 years. In fact, when he and Cheryl married in June of 1990, the ceremony was held in an airplane hangar. After his retirement in 1997, Dennis spent most of his time at the local airport in his rented hangar space. He spent his days buying airplanes, rebuilding them and selling them, in between flights over the mountains near his home in Placerville, California.

31. In June of 2003, Dennis became ill after eating leftovers from a local restaurant. For several months, he experienced frequent diarrhea and lack of appetite and lost over 50 pounds. He became concerned that something was seriously wrong with him and sought treatment from doctors at Kaiser Permanente. He became extremely frustrated because he felt so bad and the doctors could not figure out what was wrong. In the course of his treatment, Dennis reported depressive symptoms and was referred for a psychiatric consultation.

32. On December, 22, 2003, Dennis went to see Dr. Carl Taswell at Kaiser. Dr. Taswell prescribed Paxil 20 mg. Dennis filled his prescription and was given 20mg of Paroxetine manufactured by Par Pharmaceuticals. After starting Paxil, Dennis experienced classic adverse side effects including akathisia, lability, sleep disturbances and emotional blunting. He was very nervous and would pace the floor all day. He said he felt like his skin was crawling and itching. He woke up at night sweating. He was withdrawn. He stopped showering or shaving. He refused to leave the house. He kept all the blinds drawn and would not talk on the phone or watch TV. Dennis' daily journal notes that he continued to take Paxil daily. On January 13, 2004, he reported to Dr. Taswell that he was experiencing "fevers and sweats" although his temperature was normal.

33. On January 27, 2004, Dennis asked Cheryl to run several errands for him. When she returned home around 1:30 p.m., she found Dennis dead of a gunshot wound to the head. He left no note. He had been taking Paxil for 37 days.

34. Dennis Torgerson was actively seeking relief for his physical symptoms and expressed fear of dying. He was a strong Christian and had expressed anti-suicide beliefs to friends and family. Taking his own life was completely out of character for this loving, devoted husband and father.

**Legal Theories and Causes of Action**

35. Defendant GSK is liable under one or more of three different theories of liability recognized under California law.

36. All damages alleged herein were directly and proximately caused by and resulted through the individual negligent and grossly negligent acts of each Defendant, or alternatively, the combined negligence of one or more of the Defendants, and/or their irresponsible and wrongful acts.

**Damages and Remedies**

37. Plaintiffs brings this suit pursuant to California Code of Civil Procedure §377.30 to recover personal injury damages on behalf of Dennis Torgerson from the time his intitial ingestion of Paxil until his death. She further seeks such exemplary damages as he would have

been entitled. Additionally, Plaintiff further seeks to recover under California Code of Civil Procedure 377.30 *et seq.,* on behalf of all statutory beneficiaries of that cause of action for such damages as the Court deems "just." Damages are also sought for wrongful death and loss of consortium.

### First Claim for Relief (Product Liability)

38. Plaintiffs incorporate herein be reference as though fully set forth the allegations of paragraphs 1 through 37, inclusive.

39. Defendant GSK is strictly liable under the principles of RESTATEMENT (SECOND) OF TORTS, §§402A and 402B, and the new RESTATEMENT (THIRD) OF TORTS, for manufacturing and marketing defects and misrepresentations. Paxil is "defective" and Aunreasonably dangerous@ within the meaning of these doctrines, and this condition was a legal cause of Dennis Torgerson's death.

40. Defendants' conduct, *i.e.*, particularly its failure to respect the verdict of the *Tobin* jury and the ensuing judgment of this Court, was intentional and in reckless disregard of the consequences. To a high degree of probability, this conduct was willful and wanton misconduct, for which an award of exemplary damages in an amount which Dennis Torgerson would have been entitled should he have lived is appropriate. Cal. Code Civ. Pro. §377.34.

### Second Claim for Relief (Neglicense)

41. Plaintiffs incorporate herein by reference as though fully set forth the allegations of paragraphs 1 through 40, inclusive.

42. Defendants owed a duty of care to the decedent and to the plaintiffs. Defendants' conduct was unreasonable, and negligent, and was a proximate cause of Dennis Torgerson's death. The defendants' negligence includes failure to warn or to instruct for safe use, failure to test, failure to implement appropriate patient screening mechanisms, and over-promotion of Paxil. As a direct and proximate result, Dennis Torgerson took his own life and the plaintiffs were injured as alleged herein.

43. The acts and omissions of Defendants constituted negligence and gross negligence, and were the proximate cause of the occurrence and fatality in question, the death of Dennis Torgerson, and the resulting damages to the plaintiffs.

44. Defendants' conduct, *i.e.*, particularly GSK's failure to respect the verdict of the *Tobin* jury and the ensuing judgment of this Court, was intentional and in reckless disregard of the consequences. To a high degree of probability, this conduct was willful and wanton misconduct, for which an award of exemplary damages in an amount which Dennis Torgerson would have been entitled should he have lived is appropriate. Cal. Code Civ. Pro. §377.34.

### Third Claim for Relief (Breach of Warrenty)

45. Plaintiffs incorporate herein by reference as though fully set forth the allegations of paragraphs 1 through 44, inclusive.

46. Defendant GSK is also liable under a breach of warranty theory.

47. Defendant's conduct, *i.e.*, particularly its failure to respect the verdict of the *Tobin* jury and the ensuing judgment of this Court, was intentional and in reckless disregard of the consequences. To a high degree of probability, this conduct was willful and wanton misconduct, for which an award of exemplary damages in an amount which Dennis Torgerson would have been entitled should he have lived is appropriate. Cal. Code Civ. Pro. §377.34.

### Fourth Claim for Relief (Wrongful Death and Loss of Consortium)

48. Plaintiffs incorporate herein by reference as though fully set forth the allegations of paragraphs 1 through 47, inclusive.

49. As a direct and proximate result of the negligence, products liability, breach of warranty, and other wrongful conduct of the defendants, and each of them, resulting in the wrongful death of Dennis Torgerson, plaintiff CHERYL TORGERSON has been damaged and has suffered the loss of support and services of her husband, Dennis Torgerson, in a sum to be shown according to proof at the time of trial

50. As a further direct and prozimate result of the aforesaid negligence, products liability, breach of warrenty, and other wrongful conduct of the defendants, and each of them, plaintiff CHERYL TORGERSON has suffered and will suffer in the future loss of her husband Dennis

Torgerson's love, companionship, comfort, affection, solace, society, moral support and physical assistance.

51. As a direct and proximate result, plaintiff has been damaged according to proof at trial.

## Prayer

WHEREFORE, plaintiffs pray for judgment against defendants, and each of them, as follows:

1. For general, special, and consequential damages, according to proof, including but not limited to general damages for wrongful death and for loss of consortium;

2. For all pecuniary damages according to proof, including but not limited to loss of financial support and services according to proof and funeral and burial expenses, if any;

3. For nonpecuniary damages according to proof, including but not limited to loss of society, comfort, care and protection;

4. For punitive and exemplary damages according to proof at trial;

5. For all costs of suit incurred herein; and

6. For such other and further relief as the court may deem proper.

## Jury Demand

Pursuant to Rule 38(c), Fed.R.Civ.P., Plaintiffs demand their right to trial by jury of all issues triable by jury, including but not limited to liability and actual damages issues, as against GSK and all defendants in this case.

Dated: September 27, 2007                    Respectfully submitted,

THE LAW FIRM OF JOSEPH H. LOW IV

 /s/: Joseph H. Low IV_____
Joseph H. Low IV,
One World Trade Center, Suite 2320
Long Beach, CA 90831
Telephone: 562-901-0840
Attorney for Plaintiffs